RECEIVED
COURT OF CRIMINAL APPEALS
8/12/2015
ABEL ACOSTA, CLERK

# Exhibit A

Trial Court Cause Number F34688-A

Writ Number WR-82,063-01

**Declaration of Ryan Ross**

My name is Ryan Ross, my date of birth is Aug. 5, 1055, and my address is 1665 Grant St. #304, Denver, CO. 80203, Denver County, Colorado and USA. I declare under penalty of perjury that the foregoing is true and correct.

1. I am over the age of twenty-one and am otherwise competent to testify. I make the following statements based on my personal knowledge.

2. I am a private investigator licensed by state of Colorado. My license # is PI-2-130. I have a license issued by the state of Arizona. That license # is 1561125. My firm's office is at 1665 Grant St. #304, Denver, Colorado. I have extensive experience location and interviewing witnesses, and assessing their credibility.

3. On May 7, 2013, I was retained by attorney Scott Pawgan to locate and interview the five children of his client Howard Whisenant. Mr. Pawgan told me that he had reason to believe the children were living in Denver. He further explained that he was representing Mr. Whisenant in connection with an appeal of Mr. Whisenant's convictions in 2001 on multiple charges stemming from alleged crimes pertaining to Mr. Whisenant's then wife, now is ex-wife. Mr. Pawgan asked me to review trial transcripts, exhibits that had been entered into the trial, and certain other records pertaining to Mr. Whisenant's actions and conduct during the time of the events that led to his convictions. I accepted the assignment, and prepared to locate and interview the Whisenant children. I determined that they were, in fact, living in Denver, and I prepared to approach them.

4. Sometime during June in 2013 I was contacted by a Kara Ingram, who told me that she was one of Howard Whisenant's daughters. She told me she used as her surname her mother's maiden name. She told me that she'd obtained by name and number from her paternal grandmother, who told had told her that I was an investigator working for her father's attorney. I confirmed that I was. Ms. Ingram asked to meet with me to discuss what she understood to be the appeal her father was pursuing, and whether there was anything she or her siblings could do to assist their father. She explained that she and her siblings had recently developed concerns about the truthfulness of their mother's statements about their father and his criminal convictions, and had developed questions about what role they played as children in his trial.

5. On July 9, 2013, I met with Kara and Brad Whisenant at my office, then located at 2150 Curtis Street in Denver. Brad told me he is Howard Whisenant's son. I told them I had

been retained by their father's attorney, who was pursuing an appeal on their father's behalf. They asked me what I was doing on their father's behalf, and what they could to do assist their father. They told me that they had recently become concerned about the role they and their siblings played as witnesses in their father's trial. From their recollections, they said they doubted that they had testified truthfully. They told me that had developed these concerns collectively and as the sole result of inquiries they made that were not initiated by anyone outside the family. They said they had recently developed strong doubts about their mother's truthfulness on a range of matters involving their personal and professional lives. They had concluded their mother was lying to them, was doing so repeatedly, and had done so throughout their lives. As a result, they discussed among themselves the possibility that their mother had lied to them about their father's actions in the months prior to his trial in Texas in 2001. And that, they told me, gave them an interest in learning more about their testimony, and determining whether they could do anything to assist their father in his bid for a new trial or reversal of his convictions. I told them that they:

- should not discuss amongst themselves their recollections of the events that culminated in the criminal charges and trial of their father, because to do would risk having their memories shaped and influenced by the memories of their siblings.
- Should not discuss the events with their parents.
- Should not accept anything of value from their father or paternal grandparents.
- Should turn aside what they told me was an offer their father had made to tell them his side of the story of his criminal convictions.


Ms. Ingram and Mr. Whisenant told me that they appreciated my advice and that they would follow it. They said they wanted to ensure that whatever statements they might subsequently make about their roles in their father's trial were not subject to challenge on the grounds that those statements were not credible. I gave them a copy of their father's indictment, and copies of transcripts of their trial testimony. I placed a transcript of the trial testimony of each sibling in a separate envelope marked for each sibling, and asked them to hand-deliver the envelopes to the sibling named on the cover of the envelope. They said they would. I also provided them with a copy of their mother's trial testimony. I told them that once they had read their and their mother's testimony, they could contact me if they wanted me to interview them about their trial testimony and their recollections of the events that led to the filing of the criminal charges against their father.

6. Kara Ingram subsequently contacted me and we arranged to meet at her residence at 3400 S. Lowell Blvd on July 22, 2013. I interviewed her for about two hours. She said she had reviewed her and her mother's trial testimony. I asked her whether she had testified truthfully. She said with respect to several of her statements, she had not. She said she had testified falsely at the behest of - and with the encouragement of - her mother, who said she and her siblings would suffer if she didn't make the statements she said her mother wanted her to. She said one of the prosecutors in the case also encouraged her to testify falsely. It was apparent to me that Ms. Ingram was eager to assist her father by

calling attention to her false testimony. I asked her whether anyone was pressuring her to recant some of her testimony. She said no one was. I asked her whether anyone had offered an inducement to her in a bid to get her to recant some of her testimony. She said no one had. She said that as a result of reading her trial testimony she was concerned that the false statements she made had helped put in father in jail for a long time, and she wanted to correct those statements so that a judge could determine whether her father's conviction was appropriate notwithstanding her false testimony. She said that to the extent her father's conviction rested on her testimony, her father was wrongfully convicted. She said that if she were called to testify in a hearing on her father's appeal, her statements would be consistent with the statements she made to me. I subsequently wrote the draft of a declaration reflecting Ms. Ingram's statements to me, and sent it to her for her review. She made several changes, I revised the declaration, and she signed it in front of a notary on Aug. 29, 2013. I forwarded her signed declaration to Mr. Pawgan.

7. On July 22, 2013, I also met with Janey Whisenant, at the same location. She said she was the eldest child of Howard and Tracy Whisenant. I spoke with her for about two hours. She told me she had reviewed her and her mother's trial testimony. I asked her whether she had testified truthfully during the trial. She said with respect to several of her statements during the trial, she had not. She said she had testified falsely at the behest of - and with the encouragement of - her mother, who said she and her siblings would suffer if she didn't testify as her mother wanted her to. She said her mother had also testified falsely. It was apparent to me that Ms. Whisenant was eager to assist her father by calling attention to her false testimony. I asked her whether anyone was pressuring her to recant some of her testimony. She said no one was. I asked her whether anyone had offered an inducement to her in a bid to get her to recant some of her testimony. She said no one had. She said that as a result of reading her trial testimony she was concerned that the false statements she made had helped put in father in jail for a long time, and she wanted to correct those statements so that a judge could determine whether her father's conviction was appropriate notwithstanding her and her mother's false testimony. She said that to the extent her father's convictions rested on her testimony, he was wrongfully convicted. She that if she were called to testify in a hearing on her father's appeal, her statements would be consistent with the statements she made to me. I subsequently wrote the draft of a declaration reflecting Ms. Whisenant's statements to me, and sent it to her for her review. She made several changes, I revised the declaration, and she signed it in front of a notary on Aug. 13, 2013. I forwarded her signed declaration to Mr. Pawgan.

8. On July 22, 2013, I also met with Keli Whisenant, at the same location. She said she was a daughter of Howard and Tracy Whisenant. I spoke with her for about two hours. She told me she had reviewed her testimony at her father's trial in Texas in 2001. I asked her whether she had testified truthfully. She said with respect to several of her statements, she had not. She said she had testified falsely at the behest of - and with the encouragement of - her mother, who said she told her that her father would kill her and her siblings if she didn't testify as her mother wanted her to. It was apparent that Ms. Whisenant was eager to assist her father by calling attention to her false testimony. I asked her whether anyone was pressuring her to recant some of her testimony. She said no one was. I asked her

whether anyone had offered an inducement to her in a bid to get her to recant some of her testimony. She said no one had. She said that as a result of reading her trial testimony she was concerned that the false statements she made had helped put in father in jail for a long time, and she wanted to correct those statements so that a judge could determine whether her father's conviction was appropriate notwithstanding her and her mother's false testimony. She said that to the extent her father's conviction rested on her testimony he was wrongfully convicted. She said that if she were called to testify in a court hearing on her father's appeal, her statements would be consistent with the statements she made to me. I subsequently wrote the draft of a declaration reflecting Ms. Whisenant's statements to me, and sent it to her for her review. She made several changes, I revised the declaration, and she signed it in front of a notary on Aug. 12, 2013. I forwarded her signed declaration to Mr. Pawgan.

9. On July 22, 2013, I also met with Heidi Whisenant, at the same location. She said she was a daughter of Howard and Tracy Whisenant. I spoke with her for about two hours. She told me she had reviewed her and her mother's trial testimony. I asked her whether she had testified truthfully. She said that with respect to several of her statements, she had not. She said she had testified falsely at the behest of - and with the encouragement of - her mother, who said she and her siblings would suffer if she didn't testify as her mother wanted her to. She said her mother had also testified falsely. It was apparent to me that Ms. Whisenant was eager to assist her father by calling attention to her false testimony. I asked her whether anyone was pressuring her to recant some of her testimony. She said no one was. I asked her whether anyone had offered an inducement to her in a bid to get her to recant some of her testimony. She said no one had. She said that as a result of reading her trial testimony she was concerned that the false statements she made had helped out in father in jail for a long time, and she wanted to correct those statements so that a judge could determine whether her father's conviction was appropriate notwithstanding her and her mother's false testimony. She said that to the extent her father's conviction rested on her false testimony, he was wrongly convicted. She told me that if she were called to testify in a hearing on her father's appeal, her statements would be consistent with the statements she made to me. I subsequently wrote the draft of a declaration reflecting Ms. Whisenant's statements to me, and sent it to her for her review. She made several changes, I revised the declaration, and she signed it in front of a notary on Aug. 21, 2013. I forwarded her signed declaration to Mr. Pawgan.

10. On July 24, 2013, I met with Brad Whisenant at an apartment at 3400 S. Lowell Blvd in Denver. He told me he was the son of Howard and Tracy Whisenant. I spoke with him for about two hours. He told me he had reviewed his testimony at his father's criminal trial. I asked him whether he had testified truthfully. He said with respect to several of her statements during the trial, he had not. He said she had testified falsely at the behest of - and with the encouragement of - his mother, who said he and his siblings would suffer if he didn't testify as she wanted him to. He said the prosecutor who questioned him during the trial also encouraged him to testify falsely that he remembered what the prosecutor said were certain actions of his father when, in fact, he did not. It was apparent that Mr. Whisenant was eager to assist his father by calling attention to his false testimony. I

asked him whether anyone was pressuring him to recant some of his testimony. He said no one was. I asked him whether anyone had offered an inducement to him in a bid to get him to recant some of his testimony. He said no one had. He said that as a result of reading his trial testimony he was concerned that the false statements he made had helped put his father in jail for a long time, and he wanted to correct those statements so that a judge could determine whether her father's conviction was appropriate notwithstanding his false testimony.  He said that if he were called to testify in a hearing on her father's appeal, his statements would be consistent with the statements he was making to me. I subsequently wrote the draft of a declaration reflecting Mr. Whisenant's statements to me, and sent it to him for her review. He made several handwritten changes, and then signed it in front of a notary on Oct. 4, 2013. I forwarded his signed declaration to Mr. Pawgan.

11. The interviews I conducted with the Whisenant siblings in 2013 made it clear that they shared the same concerns with respect what role their false testimony played in their father's conviction. It was also clear they had shared their concerns with each other, and that with respect to what to do about their concerns they shared a desire to do what would could to correct they damage they felt they had unwittingly done during their father's trial with their false testimony. But it was also clear they had not discussed with each other their testimony or the events that led to the charges against their father. Their memories did not match. Some of them remembered the same incidents differently. Some remembered incidents that they said one or more of their siblings had also witnessed, but sometimes the sibling who was said to have been present did not remember the incident at all or remembered it differently. The differences in their memories were attributable in part to the differences in their ages. The differences enhanced the credibility of the statements they made to me.

12. I have reviewed the transcripts of the trial testimony of the Whisenant children. Comparing what they said then to what they told me in 2013, I have concluded that their statements to me in 2013 are far more likely than their trial testimony to accurately reflect what occurred with respect to the actions for which Mr. Whisenant was convicted, in large part because during the trial they were all either teenagers or pre-teens and  they were living with their mother and under her control and influence. In 2013 they were all adults living separately from their mother, and they could bring to their assessment of their conduct during their father's trial the benefit of assessments that can only be made by adults with fully developed mental capacities and capabilities.

13. An assessment of the credibility of the 2013 statements the Whisenant-Ingram siblings made in their 2013 signed declarations would be enhanced by obtaining and evaluating their testimony at a court hearing, because such statements would be subject to cross-examination, and counsel for each side and the court could make  more a far more careful assessment of their statements and their credibility.

14. I have not since 2013 been in regular contact with any of the Whisenant children that I

interviewed, but it's likely that if any of them are called to testify at a hearing on their father's appeal, their statements would be consistent with those they made to me during the interviews I conducted of them in 2013. The children told me in 2013 that they were willing to travel to Texas at their own expense to testify at any hearing in their father's appeal.

DATED this 16 day of August 2015

Ryan Ross

Subscribed and sworn to before me this 10 day of Aug , 2015

Notary Public

My commission expires on the 12 of Dec , 20 15

REBEKAH DEEDS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20074045521
MY COMMISSION EXPIRES DECEMBER 12, 2015